# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE RIVER & BAY<br>AUTHORITY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civ. No. 07-008-SLR |
| JAN D. KOPACZ, | )<br>)<br>) |
| Defendant. | ) |

Carmella P. Keener of Rosenthal, Monhait & Goddess, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Mary Elisa Reeves of Donna Adelsberger & Associates, Glenside, Pennsylvania.

Bernard A. Van Ogtrop of Seitz, Van Ogtrop & Green, Wilmington, Delaware. Counsel for Defendant.

## OPINION

Dated: August 29, 2008
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Delaware River & Bay Authority ("plaintiff") brought suit against defendant Jan D. Kopacz ("defendant") seeking a declaratory judgment; to wit, that plaintiff does not owe maintenance and cure to defendant. (D.I. 1)  The suit arises from defendant's on-the-job injury and the extent to which, if at all, plaintiff must provide an allowance covering defendant's food and lodging expenses under circumstances where an insurance policy also provides for defendant's needs.  A one-day trial was held on September 24, 2007.  Post trial briefing is complete. (D.I. 29, 31, 32, 33)  The court has jurisdiction pursuant to 28 U.S.C. § 1333.[1]  Pursuant to Fed. R. Civ. P. 52(a), the following are the court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. The Injury

1.  At all times relevant to the dispute at issue, defendant was employed as a full-time, permanent deck hand on board plaintiff's ferries. (D.I. 28 at 66; PX 15 at ¶ 1) Deck hands, also known as "able seamen," are responsible for the general operation of the ferries. (D.I. 28 at 66; PX 15 at ¶ 1)[2]

2.  On December 24, 2004, defendant sustained an injury.[3]  (Id. at 67)

---

[1]"The district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . ."

[2](PX 15) refers to the document evidencing the parties' stipulated facts. (D.I. 28 at 26)

[3]Plaintiff admits that defendant suffered an on-the-job injury for the limited purpose of the case at bar only, and makes no such admission generally or for purposes of the state court litigation. (D.I. 29 at 1 n.1)

According to defendant, he and a co-worker were attempting to lift a cable that weighed over 300 pounds. (Id. at 69) The co-worker dropped the cable, leaving defendant to bear all the weight. (Id.) Reluctant to drop the cable and have it fall on his or his co-worker's feet, defendant held on to the cable, which pulled him forward. (Id.) Defendant's hand and shoulder hit a receptacle, causing him to wrench his back. (See id.) Defendant reported the injury on the day that it occurred. (PX 15 at ¶ 2)

3. According to plaintiff's records, defendant worked on December 29, 30, and 31, 2004. (Id. at ¶ 3) Defendant called in sick on January 3, and then worked on January 4, 5 and part of January 6, 2005. (Id.) On January 5, 2005, defendant gave plaintiff a typed statement in which he recounted the injury. (D.I. 28 at 69-70) On January 6, 2005, defendant was directed to see a doctor for a determination of his fitness for duty. (PX 15 at ¶ 3) For timekeeping purposes, he was declared not fit for duty retroactive to January 5, 2005 and has not returned to work since that time.[4] (Id.; D.I. 28 at 70)

## B. The Benefits

4. Defendant received and signed a copy of plaintiff's personnel manual on March 9, 2001.[5] (PX 5; D.I. 28 at 31) The manual states that the purpose of long term disability ("LTD") insurance is to "provide a continuing income should the employee's

---

[4]Defendant has offered to perform light duty work for plaintiff but was told that no light duty work was available. (D.I. 28 at 72)

[5]The personnel manual, as it existed on March 9, 2001, is the version that remained in effect during the period at issue. (See D.I. 28 at 32)

ability to earn a living be interrupted or terminated by a prolonged disability."[6] (PX 5 at 26) Plaintiff has never bought an insurance policy specifically to cover only its maintenance obligations to seamen. (D.I. 28 at 41)

5. Under the collective bargaining agreement for marine employees that was in place as of the date of defendant's injury, plaintiff was obligated to provide seamen with the same benefits to which all other permanent full-time employees were entitled. There is nothing in the agreement which pertains to maintenance payments; however, the agreement does address the LTD policy.[7] (DX 3a at 46; D.I. 28 at 30-31, 41-42)

6. It was plaintiff's policy to pay permanent full-time employees their full wages for the first 90 days following an on-the-job injury which rendered the employee unable to perform his duties. (PX 15 at ¶ 4; D.I. 28 at 32-33) "If it appears that the employee will not be returning to work within that 90 day period, a claim for LTD is started for the employee." (D.I. 28 at 33) Starting on the 91st day, the employee is covered under LTD at a rate of 60% of his pay. (D.I. 28 at 33)

7. Pursuant to plaintiff's policy, defendant received 100% of his weekly wage ($9,906.67) from January 5, 2005 through April 5, 2005. (PX 15 at ¶ 4; D.I. 28 at 33) As there was a delay in processing defendant's LTD benefits, however, plaintiff paid defendant the sum of $ 4,624.93, which represented the value of his accumulated sick

---

[6]"The plan covers disability that may result from an accident or illness lasting more than three (3) months." (PX 5 at 26)

[7]The collective bargaining agreement provides: "Employer agrees to continue to provide to all permanent full-time employees long-term disability plans that are offered to . . . employees generally." (DX 3a at 46, ¶ 34.3)

3

and annual leave.[8]  (PX 15 at ¶ 5)

8.  According to Bonnie L. Miller ("Miller"), plaintiff's risk manager, the payment

of annual leave to defendant was not used as maintenance, but was paid to ensure that

he received some kind of income to meet his living expenses until his LTD claim was

approved.  (D.I. 28 at 45-46)  In Miller's opinion, annual leave is unrelated to

maintenance.  (Id. at 43)

9.  Defendant received checks from plaintiff, due to a mistake on Miller's part,

which were intended to partially cover its maintenance obligation for the period April 5,

2005 through May 31, 2005.[9]  (PX 13E; D.I. 28 at 36)  A check for $855.00 was sent to

---

[8]The personnel manual provides that:

> Individuals who have satisfied the three (3) month qualifying
> period and have been approved by the insurance carrier may
> request in writing the payment of any Annual Leave credited
> to them.  All leave accrual will cease as of the effective date of
> approval by the LTD carrier until such time that the employee
> returns to work.
>
> Accrued Sick Leave benefits remaining will not be paid until
> two years after commencement of disability.

(PX 5 at 27)  Plaintiff "bent the rules" for defendant when he was given his accrued sick
leave at this time.  (D.I. 28 at 46-47)

[9]Pennsylvania Manufacturer's Association ("PMA"), the insurance company
which provided the LTD coverage to all plaintiff's full-time permanent employees before
Hartford, required that plaintiff pay its seamen "maintenance wages" in the amount of
$450 per month, and deducted this amount from the LTD benefit paid to the seamen.
(PX 15 at ¶¶ 8, 9)  Consequently, plaintiff was accustomed to paying, through PMA, a
$15 per day partial maintenance obligation, which amount was used to offset any LTD
benefit paid by PMA.  (D.I. 28 at 36)  The parties have not pointed to, nor was the court
able to find, any evidence of record indicating when plaintiff switched from PMA or why
the change was made.  Similarly, there is no evidence before the court regarding the
specific terms of the PMA LTD policy.

4

defendant with a note from Miller stating: "This check . . . represents wages for the period of your disability from 4/5/05 through 5/31/05. Please be advised that maintenance wages paid by [plaintiff] directly will offset your LTD benefit – but together the payments will equal 60% of your base wages." (PX 13E) Plaintiff also sent checks with similar notations for June and July 2005 in the amounts of $450.00 and $465.00, respectively. (Id.; D.I. 28 at 36) It was Miller's impression, at that time, that these checks represented partial maintenance payments to defendant. (D.I. 28 at 36-37)

10. The Hartford Insurance Company ("Hartford"), the LTD provider during the period in dispute, calculates an employee's monthly LTD benefit by: (1) multiplying the monthly income loss by the benefit percentage; (2) comparing the result with the maximum benefit; and (3) deducting other income benefits from the lesser amount. (DX 4a at 7) Other income benefits are defined as "the amount of any benefit for loss of income, provided to you or to your family, as a result of the period of disability for which you are claiming benefits under this plan." (Id. at 16) Other income benefits include disability benefits received from Social Security.[10] (Id.) With respect to overpayments, Hartford notes that it has "the right to recover . . . any amount that is an overpayment of benefits under this plan."[11] (Id. at 14)

_____

[10]Other income benefits also includes "temporary disability benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges for such benefits," as well as "permanent disability or impairment benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, similar law or substitutes or exchanges of such benefits." (DX 4a at 16)

[11]"An overpayment occurs when it is determined that the total amount . . . paid in benefits is more than the amount that was due . . . under the plan." "This includes, but is not limited to, overpayments resulting from: (1) retroactive awards of Other Income Benefits; (2) failure to report, or late notification to [Hartford] of Other Income Benefits

11. On June 17, 2005, Hartford approved defendant's claim for LTD benefits. (PX 2C) That same month, defendant received a lump sum payment from Hartford in the amount of $ 4,612.01.[12] (PX 15 at ¶ 6) This payment represented LTD benefits retroactive to April 5, 2005. (Id.) In July 2005, defendant received an additional check for $ 1191.30, which represented an underpayment by Hartford in his initial check. (Id. at ¶ 7) According to Hartford's records, defendant received LTD benefits from July 2005 through October 2006 in the amount of $2192.11 on a monthly basis, for a total of $32,713.95 before taxes. (Id. at ¶ 10)

12. On May 11, 2006, defendant signed a Hartford form entitled "LTD Payment Options and Reimbursement Agreement." (PX 2B) On this form, defendant had two choices regarding his payment of LTD from Hartford. (Id.) Specifically, defendant could elect to either: (1) have Hartford estimate the amount of his primary Social Security disability benefits and reduce his monthly LTD benefit by that amount, with the rate adjusted after Hartford received proof showing the amount of defendant's Social Security disability benefits; or (2) Hartford would pay monthly LTD with no reduction for estimated Social Security disability benefits. (Id.) Defendant selected the second option and, by so doing, acknowledged that he understood that "this may result in an overpayment of [ ] LTD benefits which [ ] will be required to [be] refund[ed] to Hartford in

---

or earned income; (3) misstatement; or (4) any error we may make." (DX 4a at 14)

[12]Defendant did not pay the premiums for the LTD policy, and the benefits were provided to him without any charge to him. (PX 15 at ¶ 22; D.I. 28 at 30) LTD benefits have been made available to all permanent, full-time employees of plaintiff for more than 25 years. (PX 15 at ¶ 23) As with every other LTD carrier plaintiff has had, part of the policy is that other income of the employee offsets the LTD benefit. (D.I. 28 at 51)

6

a lump sum." (Id.)

15.   By letter dated October 6, 2006, defendant was notified by the Social
Security Administration that he was eligible for Social Security disability benefits ("Social
Security benefits") retroactive to July 2005. (PX 15 at ¶ 11; PX 3)  Defendant received
a payment that same month in the amount of $17,142.00, representing his benefits
from July 2005 through September 2006. (PX 3; see also PX 15 at ¶ 12)  After the
initial payment, defendant's monthly Social Security benefits were $1,167.00. (PX 3)

16.   On October 27, 2006, Hartford demanded that defendant reimburse the
$16,607.92 which had been overpaid to him in light of the retroactive Social Security
benefits paid. (PX 15 at ¶ 13; DX 4h)  Defendant refused to repay this amount to
Hartford[13] and Hartford suspended his LTD benefits as a result. (See D.I. 28 at 73)
More specifically, Hartford stopped payment only because defendant refused to return
the amount of Social Security benefits, representing his back payment of benefits.[14]
(D.I. 28 at 56)  Defendant has not received any LTD benefits since October 2006. (PX
15 at ¶ 14; D.I. 28 at 73)  No repayment to Hartford has been made.[15] (PX 15 at ¶ 16)

----

[13]This decision was made on the advice of counsel. (D.I. 28 at 73)

[14]Defendant's counsel agreed that, had his client passed along the retroactive
lump sum payment from Social Security, Hartford would have continued to pay the
approximately $1000 payment such that defendant would have received approximately
$2100 per month, albeit from two different sources. (D.I. 28 at 98-99)

[15]During discussions between counsel, defendant sought to have plaintiff repay
the sum sought by Hartford, which led to the filing of this declaratory judgment action by
plaintiff so that its rights and obligations could be determined by the court. (PX 15 at ¶
15)  Plaintiff's counsel also attempted to negotiate a compromise whereby plaintiff
would consider repaying the amount, as long as defendant agreed to reimburse plaintiff
if the court concluded that plaintiff's position was correct.  Counsel for defendant
rejected this approach. (Id.)

18. Plaintiff's employees know when they file their statement with the LTD carrier that, if they are approved to receive Social Security benefits, they will pay back any duplication of LTD benefits to the LTD carrier.[16] (D.I. 28 at 51-52) Full-time permanent seamen have always accepted the full pay for 90 days and then the LTD benefits beyond the 90-day period. (Id. at 47) Seasonal employees, in contrast, are paid 15 dollars a day or their provable living expenses until they reach maximum medical improvement. (Id. at 47-48)

19. In Miller's experience, plaintiff has never provided maintenance to its permanent full-time employees, other than through a LTD policy; no seaman other than defendant has questioned the LTD portion of his benefits. (Id. at 57) Miller has never made any effort on behalf of plaintiff to have a seaman, who was receiving Social Security benefits, pay back to plaintiff any part of those benefits against the maintenance obligation. (Id. at 52)

20. Since October 2006, defendant has been receiving monthly Social Security benefits of $ 1167.00. (PX 15 at ¶ 17) For the period of October 2006 through April 2007, this is the only income defendant has received, with the exception of some interest earned on a money market account.[17] (D.I. 28 at 73, 92)

21. Defendant's monthly living expenses from January 5, 2005 through April 5, 2007 totaled $2190.00. (PX 15 at ¶ 18) As of April 5, 2007, defendant had reached

---

[16]Defendant did not present any testimony to the contrary.

[17]The money market account "pays . . . a couple hundred dollars every now and then." (D.I. 28 at 73) Defendant also testified that the loss of the income from Hartford has affected him physically in that he often feels dizzy, anxious, and tense when he has to pay his bills. (Id. at 73-75)

8

maximum medical improvement with respect to any injury sustained on December 24, 2004. (Id. at ¶ 19) Defendant has not been fit to return to duty as a seaman on plaintiff's ferries since January 5, 2005. (Id. at ¶ 20) Defendant has not been denied any medical treatment following the December 24, 2004 injury as a result of any action or inaction by plaintiff. (Id. at ¶ 21)

22. Once defendant became disabled, he remained eligible for medical and life insurance benefits and did not pay any portion of the premium for these benefits. (Id. at ¶ 24) While employed by plaintiff, defendant was not provided with any food or lodging on board plaintiff's ferries on which he served. (Id. at ¶ 25)

## III. CONCLUSIONS OF LAW

1. "Maintenance . . . is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." Vaughan v. Atkinson, 369 U.S. 527, 531 (1962). In particular, "[m]aintenance is the living allowance for a seaman while he is ashore recovering from injury or illness," Barnes v. Andover Co., LP, 900 F.2d 630, 633 (3d Cir. 1990); however, it is not a substitute for wages. Shaw v. Ohio River Co., 526 F.2d 193, 199 (3d Cir. 1975). "Cure is payment of medical expenses incurred in treating the seaman's injury or illness."[18] Barnes, 900 F.2d at 633. "[T]he injured seaman bears the burden of establishing that he is eligible for maintenance and cure." Smith v. Delaware Bay Launch Service, Inc., 972 F. Supp. 836, 849 (D. Del. 1997).

_____

[18]At the outset, the court notes that defendant makes no claim for cure. (D.I. 21 at 21)

9

2. Plaintiff requests that the court reconsider its ruling in Smith v. Delaware Bay Launch Service, Inc., 972 F. Supp. 836, 849 (D. Del. 1997), in which the court determined that "blue water" seamen and "shore-based" seamen alike may seek maintenance from the vessel's owner when injured.[19] (D.I. 29 at 9) The United States Court of Appeals for the Third Circuit, in Barnes, addressed this issue in the following passage: "We know of no authority, however, for holding that a seaman is not entitled to the traditional privileges of his status merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren." 900 F.2d at 642 (quoting Weiss v. Central Ry., 235 F.2d 309, 313 (2d Cir. 1956)). Although the Third Circuit did not explicitly hold that "shore-based" seamen are entitled to maintenance, the court, in Smith, interpreted the above passage, inter alia, to support its determination that "shore-based" seamen are entitled to maintenance. 972 F. Supp. at 848. In the case at bar, plaintiff has not presented any additional authority. Therefore, the court declines the invitation to reconsider its previous holding. Defendant is entitled to maintenance, even though he did not receive food or lodging on board the vessel while employed.

3. As noted above, the parties have agreed that the amount of the maintenance obligation owed is $2190.00 per month for the period April 5, 2005 through April 5, 2007. The parties, however, dispute from what source the maintenance payment may originate.

---

[19]In this regard, plaintiff contends that, because maintenance covers only food and lodging expenses, a "shore-based" seaman is not entitled to maintenance when that seaman did not receive food or lodging on-board the vessel while employed.

10

4. Defendant first contends that the "obligation to pay maintenance is exclusively that of the shipowner." (D.I. 31 at 7)  In particular, defendant asserts that plaintiff "seeks to have this [c]ourt rewrite the law of maintenance to enable the shipowner to be no more than overseer or umpire which assembles funds from sources other than itself . . . ." (Id.)  The Supreme Court, however, has recognized that, when maintenance obligations are met by "others," the seaman is not entitled to additional maintenance payments from the shipowner. See Vaughan, 369 U.S. at 533 (discussing Johnson v. United States, 333 U.S. 46, 68 (1948)).  The Third Circuit also has recognized that a "vessel owner [may] insure against his maintenance obligation," under certain circumstances. Shaw, 526 F.2d at 200.  Consistent with these observations, the court declines to hold that maintenance payments must come exclusively from the shipowner.[20]

5. Defendant, relying on Shaw, further argues that plaintiff is not entitled to receive a credit or offset of its maintenance obligation for the LTD benefits paid pursuant to the Hartford LTD policy. (D.I. 31 at 8)  In Shaw, the shipowner, pursuant to

---

[20]This is not inconsistent with Aguilar v. Standard Oil Co. Of New Jersey, 318 U.S. 724 (1943), upon which defendant relies. In Aguilar, the court stated that "the nature and foundations of the liability require that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes. If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf." 318 U.S. at 735. "The ancient rule in the admiralty that the vessel and her owner must provide an injured seaman with maintenance was intended to assure him three meals [a] day and a bed in which to sleep during his treatment and convalescence." Gooden v. Sinclair Refining Co., 378 F.2d 576, 580 (3d Cir. 1967). As long as the maintenance obligation is satisfied, the source which satisfies it is immaterial. Cf. Aguilar, 318 U.S. at 735 (determining whether a maintenance obligation is owed, not the source of the obligation).

11

a collective bargaining agreement, paid the premium on an insurance policy which

provided for weekly payments during periods of non-occupational disability. 526 F.2d at

200. The premiums in Shaw were "clearly" the result of a wage agreement. Id. In

particular,

> the collective bargaining agreement in this case contained no provision
> specifying that payments from the insurance company under the benefits
> plan would be in lieu of maintenance. Undoubtedly a vessel owner could
> insure against his maintenance obligation by a benefits program tailored
> to that end but there is no indication in the collective bargaining
> agreement before us that this was done. Instead, the employer's premium
> obligation appears to be simply a part of the wage package.

Id. The benefits were "designed to replace lost wages, not to provide room and board

and medical treatment." Id. "Moreover, the benefits [had] nothing to do with the vessel

owner's separate maintenance obligation, for they would be payable even if [the

seaman] were ineligible for maintenance."[21] Plaintiff reads Vaughan to support its

position that "if the seaman is provided with the money to pay his living expenses, the

shipowner should be relieved of its obligation, especially if that money comes from an

insurance policy funded by the shipowner for the benefit of that seaman." (D.I. 29 at 6)

6. Looking to Shaw for guidance on whether the LTD policy at bar can be

deemed to satisfy plaintiff's maintenance obligations, the court concludes that it cannot.

In the first instance, Hartford's LTD policy covers all permanent full-time employees, not

just seamen; however, only seamen are entitled to maintenance. Therefore, absent

---

[21]The Third Circuit also differentiated between a LTD policy and Blue Cross-Blue
Shield benefits: "The essential difference between the Blue Cross-Blue Shield and the
[LTD] payments is that the former provides the exact equivalent of maintenance and
cure whereas the latter, at least under this collective bargaining agreement, constitutes
a substitute for lost wages which are owed to a seaman even if he is ineligible for
maintenance and cure." Shaw, 526 F.2d at 201.

specific language denoting the difference between the LTD benefits paid to seamen versus those benefits paid to other of plaintiff's employees, the Third Circuit in Shaw has held that the benefits are meant to replace lost wages, not to provide for maintenance. Shaw, 526 F.2d at 200. This conclusion is buttressed by the description of the LTD policy in plaintiff's personnel manual, that is, to "provide a continuing **income** should the employee's ability to earn a living be interrupted or terminated by a prolonged disability." (PX 5 at 26) (emphasis added)

7. The court is sympathetic to plaintiff's argument that allowing defendant to recover an additional $2,190 per month from plaintiff, when he received this amount pursuant to an insurance policy purchased by his employer for his benefit, not only results in a double recovery but may discourage the continued offering of such disability benefits by shipowners in the future. (D.I. 29 at 6-7) Under Shaw's guidance, plaintiff could have used its LTD policy to provide maintenance, but failed to so identify the benefits as such.[22] Because the LTD benefits given cannot be deemed maintenance under Shaw, no double recovery exists.[23]

8. Defendant also argues that plaintiff may not claim a credit against its

---

[22]An employer most certainly may insure its maintenance obligation, so long as it is "tailored to that end." Shaw, 526 F.2d at 200.

[23]To this end, Gooden is inapposite. In Gooden, the Third Circuit determined that when a seaman seeks to recover full damages based upon unseaworthiness and negligence, "in which he claims loss of wages including the value of the board and lodging which form part thereof, he has thereby recovered the maintenance and cure to which he is entitled." 378 F.2d at 581. "In other words, a seaman cannot have both damages and maintenance and cure if there would result any duplication of recovery upon a single claim." Id. In this regard, the court notes that the only issue presently before it is the scope of plaintiff's maintenance obligation; damages are not at issue.

13

maintenance obligation for the Social Security benefits he obtained pursuant to
Hartford's LTD policy. (D.I. 31 at 8-9) Defendant argues in this regard that "the receipt
of Social Security benefits should be treated no differently than the receipt of LTD
benefits for the purposes of determining whether plaintiff has met its maintenance
obligation to defendant." (D.I. 29 at 10) Having determined that LTD benefits, in this
case, may not offset an employer's maintenance obligation, and in the absence of any
authority supporting an employer credit,[24] the court agrees that plaintiff cannot offset its
maintenance obligation by the Social Security benefits paid to defendant.[25]

9. With respect to damages, "[i]f the shipowner unreasonably refuses to pay a
marine employee's claim for maintenance and cure, the employee may recover
consequential damages, including lost wages, pain and suffering, and attorneys' fees
and costs." O'Connell v. Interocean Management Corp., 90 F.3d 82, 84 (3d Cir. 1996).
The court concludes that, on the record presented, plaintiff acted reasonably in its belief
that defendant had been provided with sufficient income to meet his living expenses
through its provision of the LTD policy. Despite defense counsel's argument to the

---

[24]Plaintiff presents two cases addressing the interplay between Social Security
benefits and maintenance; however, neither support the proposition that Social Security
benefits may be used to offset maintenance as a matter of course. See Grissom v.
Seal Fleet, Inc., Civ. No. 96-724, 1997 WL 7222959 (Nov. 18, 1997 E.D. La.) (denying
summary judgment because genuine issues of material fact existed as to the amount
the seaman contributed to Social Security); In re Pelican Marine Partners, Civ. No. 96-
2903, 1996 WL 665753 (Nov. 15, 1996 E.D. La.) (denying summary judgment to
employer because employee partially contributed to Social Security and likening Social
Security to a privately obtained policy).

[25]This is not to say, however, that defendant is entitled to keep the Social
Security benefits that Hartford seeks as an overpayment; that question, at least to the
court's knowledge, is unresolved but not before the court in this proceeding.

14

Case 1:07-cv-00008-SLR    Document 34    Filed 09/02/2008    Page 16 of 16

contrary, mere awareness of Shaw and access to maritime lawyers does not make plaintiff's behavior unreasonable. The evidence shows that plaintiff provided defendant with the funds necessary to meet his living expenses through payment of accrued annual and sick leave, partial maintenance payments, and LTD benefits. Although defendant did not receive LTD benefits from Hartford during the period October 2006 to April 2007, this was defendant's and his counsel's decision. It is undisputed that Hartford would have continued to provide a monthly payment had defendant remitted the lump sum Social Security payment, in excess of $16,000, to Hartford. In other words, there is nothing before the court to indicate that plaintiff's behavior was "callous" or "recalcitrant"; in fact, plaintiff had no involvement in defendant's decision in this regard. See Deisler v. McCormack Aggregates Co., 54 F.3d 1074, 1087 (3d Cir. 1995). Prejudgment interest, however, is appropriate in this instance. See id. ("The Supreme Court has repeatedly held that prejudgment interest is merely an element of a plaintiff's complete compensation.").

## IV. CONCLUSION

For the reasons stated, defendant is entitled to maintenance from plaintiff.[26] An appropriate order shall issue.

---

[26]Plaintiff is entitled to a credit for the partial maintenance payments made covering the months of April 2005 to July 2005 for a total of $1,770.00. The total maintenance due defendant for the two years at issue is $52,560.00, based on the agreed upon rate of 2,190.00 per month. After crediting plaintiff's partial payments, defendant is due $50,790.00.